# JUDGE BUCHWALD

BLANK ROME, LLP
Attorneys for Plaintiff
TSAVLIRIS SALVAGE (INTERNATIONAL) LTD.
Thomas H. Belknap, Jr. (TB-3188)
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000

**07 CV 10529**

NOV 21 2007
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TSAVLIRIS SALVAGE (INTERNATIONAL) LTD., | 07 Civ. *10529* |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | |
| TRANSAMMONIA AG, | |
| Defendant. | |

Plaintiff, TSAVLIRIS SALVAGE (INTERNATIONAL) LTD. ("Plaintiff"), by its attorneys Blank Rome LLP, complaining of the above-named Defendant, TRANSAMMONIA AG, ("Defendant"), alleges upon information and belief as follows:

1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has admiralty jurisdiction under 28 U.S.C. §1333. The Court also has "federal question" jurisdiction pursuant to 28 U.S.C. § 1331.

2.    At all material times, Plaintiff was and now is a foreign corporation with its principal place of business at 10 Akti Poseidonos, 18531, Piraeus, Greece.

3.      At all material times, Defendant was and is a foreign corporation or other business entity organized under the laws of a foreign nation with its principal place of business at Bahnhofstrassel, CH-8852, Altendorf, Switzerland and with no place of business in the United States.

4.      Plaintiff is a large international marine salvage company which is in the business of commercial marine salvage of vessels and other maritime property.

5.      The M/V JOHNNY P (the "Vessel") was a five-hold bulk carrier.  On or about October 28, 2006, the vessel suffered a casualty in the course of a laden voyage from the Ukraine to Lagos, via Piraeus for bunkers.  Specifically, at about 1730 on that day, the bolts to the aft coupling on the camshaft failed (the "Incident").  At the time, the Vessel was approximately 110 miles south of Pilos, Greece.  The damage was not repairable at sea, and the master and the owner of the Vessel thus sought assistance.

6.      On or about October 29, 2006, an agreement was reached on the "LOF 2000" form of salvage agreement between Plaintiff and the owners of the M/V JOHNNY P, her cargo, bunkers, and stores, whereby Plaintiff agreed to render marine salvage services to assist the Vessel following the Incident (the "Salvage Agreement").

7.      Plaintiff arranged for a tug in Piraeus to proceed to the Vessel to render salvage assistance.  The tug succeeded in getting a towline to the M/V JOHNNY P and, notwithstanding severe gale force winds, ultimately was successful in towing the Vessel and cargo to Piraeus where she was re-delivered to the owner on or November 2, 2006.

8.      The Salvage Agreement calls for arbitration of disputes thereunder in London, and Plaintiff subsequently commenced arbitration in London pursuant to the Salvage Agreement seeking a salvage award in respect of the Incident.

9.     Plaintiff reached a settlement with the owners of the M/V JOHNNY P in January 2007 in respect of its claim for a salvage award; however, no settlement was reached with the owners of the cargo aboard the Vessel and consequently the arbitration proceedings continued as between Plaintiff and the cargo owners.

10.     During the course of the arbitration, disputes arose as to whether Defendant or the cargo receiver, Sunshine Oil and Chemical Development of Nigeria ("Sunshine"), was the owner of the cargo at the time the salvage services were performed.   This issue was ultimately submitted to the arbitrator for decision in the context of an application by Plaintiff for an order directing Defendant to post security in respect of its claim.  Defendant argued to the arbitrator that Sunshine oil was the party responsible to post security because at the time of the salvage services "risk of loss" had already passed under the contract between Defendant and Sunshine in respect of the cargo.  The arbitrator issued an interim award and reasons on November 17, 2006 (the "Interim Award") by which it rejected Defendant's position and ruled that "Transammonia were owners of the cargo at the time of the contract" and therefore that "Transammonia are parties to the salvage agreement."  A copy of the Interim Award is attached hereto as Exhibit "A".

11.     In the Interim Award the arbitrator directed Transammonia to post security to Plaintiff for an eventual salvage award; however, Defendant Transammonia failed to comply with the Interim Award and has, to date, posted no security in respect of Plaintiff's claims herein.

12.     The arbitration proceeded on the merits of Plaintiff's salvage claim, and the arbitrator issued his arbitration award on May 21, 2007 (the "Award").  A copy of the Award is attached herewith as Exhibit B.  In the Award, the arbitrator ruled that the salved value of the

cargo was $6,048,911 and that Plaintiff was entitled to a salvage award of $246,179 from Defendant in respect of its salvage of the cargo.

13.    In the Award, the arbitrator further awarded interest at 7.30% per annum from November 2, 2006 through May 21, 2007, plus interest at 9.25% per annum thereafter. The arbitrator further awarded Plaintiff the sums of €23,636.64 and £5,000 as indemnity against costs incurred by Plaintiff in respect of its attempt to obtain security. The arbitrator further directed that Defendant pay the Plaintiff's cost of the arbitration, including any fees or costs charged by the Counsel of Lloyd's for their services and also the arbitrator's costs of £7,550.

14.    As was its right, Plaintiff appealed from the arbitration award on the grounds that the award was unjustly low and unfair. The appeal was heard by the appeal arbitrator on September 19, 2007. By appeal award issued on October 11, 2007 (the "Appeal Award"), the appeal arbitrator increased the award to $435,247.18. A copy of the Appeal Award is attached as Exhibit C.

15.    The appeal arbitrator confirmed the Award in all other respects and further ordered that Plaintiff be awarded its costs of the appeal and the fees of the Counsel of Lloyd's in relation to the appeal, as well as the arbitrator's fees and costs of £8,250. The appeal arbitrator further directed that any payable interest on fees and costs would be at the rate of 9.25% per annum.

16.    In sum, the quantum of the Appeal Award is calculated as follows:

| Summary and Claim Amount | | Conversion | US$ equivalent |
|---|---|---|---|
| Salvage Award plus Clause 8.1 interest | US$452,744.12 | | US$452,744.12 |
| Clause 6.3 Expenses | € 23,636.64 | 1.47 | 34,745.86 |
| | £5,000.00 | 2.05 | 10,250.00 |
| Arbitrator's Award fees | £7,225.00 | 2.05 | 14,811.25 |
| Corporation of Lloyds fees | £930.00 | 2.05 | 1,906.50 |
| Contractor's costs of first Award | € 30,444.45 | 1.47 | 44,753.34 |
| Appeal Arbitrator's Award fees | £8,250.00 | 2.05 | 16,912.50 |
| Corporation of Lloyds fees (Appeal) | £485.25 | 2.05 | 994.76 |
| Contractor's costs of Appeal Award | € 10,599.10 | 1.47 | 15,580.68 |
| Interest on USD sums due | US$17,784.16 | | 17,784.16 |
| Interest on € sums due | € 2,156.58 | 1.47 | 3,170.18 |
| Interest on £ sums due | £543.30 | 2.05 | 1,113.77 |
| **Total due as at 20/11/2007** | | | **US$614,767.12** |

17.    In addition to the foregoing, post-award interest continues to accrue at the rate of $150.20 per day.  Assuming a further year of post-award interest before enforcement is obtained, this would amount to US$54,823.

18.    The Appeal Award is final and not subject to any further appeal.

## FIRST CAUSE OF ACTION

### (Recognition and Enforcement Of The Appeal Award)

19.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs in this Complaint as if set forth herein in full.

20.    Plaintiff hereby petitions this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et. seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et. seq.* (the "New York Convention"), for an order confirming the Appeal Award in favor of Plaintiff and against Defendant Transammonia AG.

21.    Both the United States and the United Kingdom, the country in which the Appeal Award was rendered, are signatories to the New York Convention.

22.    Jurisdiction is proper in this Court pursuant to 9 U.S.C. § 203.

23.    Venue is proper in this Court pursuant to 9 U.S.C. § 204.

24.    A true and accurate copy of the Appeal Award is attached hereto as Exhibit C.

25.    No grounds exist for refusal or deferral of recognition or enforcement of the Appeal Award against Defendant.

26.    For the foregoing reasons, this Court should enter judgment in favor of Plaintiff and against Defendant recognizing and enforcing the Appeal Award in the amount of $614,767.12 plus post-award interest at 9.25% to accrue from the date of this Complaint until satisfaction of the award.

## SECOND CAUSE OF ACTION

### (Salvage Award)

27.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs in this Complaint as if set forth herein in full.

28.    Alternatively or additionally to Count I, above, Plaintiff voluntarily rendered salvage services in respect of Defendant's cargo, which was in marine peril, as a result of which its cargo was successfully salved and ultimately delivered pursuant to Defendant's contract of carriage with the Vessel owners.

29.    Defendant was the owner of the cargo at the time the salvage services were provided.

30.    The salved value of the cargo was $6,048,911.

31.    Plaintiff is entitled to a salvage award against Defendant in the amount described and for the reasons set forth in the Appeal Award.

32.     Nothing herein shall be construed as a waiver of arbitration nor of Plaintiff's right to enforce the arbitration awards obtained against Defendant in respect of this matter.

### THIRD CAUSE OF ACTION

### (Enforcement of Salvage Agreement)

33.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs in this Complaint as if set forth herein in full.

34.     Alternatively or additionally to Counts I and II, above, Plaintiff is entitled to a salvage award against Defendant pursuant to the salvage contract by which Plaintiff provided salvage services to the Vessel and Defendant's cargo.

35.     Defendant was the owner of the cargo at the time the salvage services were provided.

36.     The Vessel master and owners were authorized to, and did, enter a salvage contract with Plaintiff to salve the cargo in respect of the Incident.

37.     The salved value of the cargo was $6,048,911.

38.     Plaintiff is entitled to a salvage award against Defendant in the amount described and for the reasons set forth in the Appeal Award.

39.     Nothing herein shall be construed as a waiver of arbitration nor of Plaintiff's right to enforce the arbitration awards obtained against Defendant in respect of this matter.

### RULE B ATTACHMENT

40.     In addition to the foregoing, Plaintiff seeks attachment of Defendant's property within the district pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. The total amount of Plaintiff's claims for which Plaintiff requests issuance of Process of Maritime Attachment and Garnishment is **$669,590.12**, representing the sum of the

amounts awarded under the Appeal Award (see paragraph 16 above) plus one year's post-award interest calculated at the rate awarded in the Appeal Award.

41.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendants are believed to have or will have during the pendency of this action, assets within this district consisting of cash, funds, freight, hire credits in the hands of garnishees in this District, including but not limited to electronic fund transfers.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee in the district which are due and owing or otherwise the property of the Defendant up to the amount of **$669,590.12** to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Appeal Award be recognized and that judgment be entered against Defendant and that that Plaintiff's claims herein be granted in full;

D.

That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY

November 21, 2007

Respectfully submitted,
BLANK ROME, LLP
Attorneys for Plaintiff
TSAVLIRIS SALVAGE (INTERNATIONAL)
LTD.

By

Thomas H. Belknap, Jr. (TB-3188)
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000

## VERIFICATION

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF NEW YORK       )

Thomas H. Belknap, Jr., being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and of the firm of Blank Rome

LLP, attorneys for the Plaintiff.

2.      I have read the foregoing Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff is that

Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and

statements made to me by representatives of the Plaintiff.

_____
                                    Thomas H. Belknap, Jr.

Sworn to before me this
21st day of November 2007

_____
        Notary Public

**LESCENE GIBBONS**
Notary Public, State of New York
No. 01GI6044509
Qualified in New York County
Commission Expires July 10, 20 10

17-NOV-2006  10:35   FROM  Quadrant Chambers        TO  00302109475301        P.02/08

From: M. N. Howard Q.C.

**Tel : 020 7583 4444**    **QUADRANT CHAMBERS,**    **Fax : 020 7583 4455**
**QUADRANT HOUSE,**
**10 FLEET STREET,**
**LONDON EC4Y 1AU**

17th November, 2006

## JOHNNY — Lloyd's Form dd 29th August 2006

Dear Sirs,

    I attach my Interim Award and Reasons following the hearing yesterday evening.

                Yours faithfully,

Norton Rose, attn Andrew Fisher
Fax No. +30 210 94 75 351

Hill Dickinson International, attn Patrick Hawkins
+30 210 428 4777

Ince & Co, attn James Wilson/Steven Fox
Fax No. 020 7481 4968

Quadrant Chambers, attn John Walker
Fax No. 020 7583 4455

Email: michael.howard@quadrantchambers.com

WHEREAS by an Agreement dated the 29th October 2006 on the Standard Salvage Agreement approved and published by the Council of Lloyd's and known as "LOF 2000" made between Tsavliris Salvage (International) Ltd (hereinafter called the "the Contractors") and by a representative for and on behalf of the Owners of the JOHNNY P, her bunkers, stores, cargo and freight at risk (if any) (hereinafter together called "the Respondents") it was agreed among other things that the Contractors should use their best endeavours to salve the JOHNNY P and her bunkers, stores, cargo and freight at risk (if any) and take them to Piraeus that in the event of success the remuneration therefor would be decided by arbitration in London in the manner therein prescribed and that the award should be made in United States dollars

AND WHEREAS under the provisions of the said Agreement the Council of Lloyd's appointed me MICHAEL NEWMAN HOWARD, one of Her Majesty's Counsel, as sole Arbitrator;

AND WHEREAS a dispute arose as to the identity of the person obliged to put up security for the claim of the Contractors arising out of the salvage of the cargo laden on board the JOHNNY P and the manner in which the Contractors' right to such security was to be enforced or otherwise protected;

NOW THEREFORE I, the said MICHAEL NEWMAN HOWARD, having taken upon myself the burden of the reference in accordance with the terms of the said Agreement, and having duly weighed and considered the evidence and documents laid before me and the arguments of the parties by their respective Counsel who attended before me DO HEREBY MAKE THIS MY INTERIM FINAL AWARD in writing concerning the matters in question;

AND I AWARD AND DECLARE that the company Transammonia AG were the owners of the said cargo and as such were parties to the contract aforesaid;

AND I FURTHER AWARD AND DIRECT that the said Transammonia AG do provide security, in accordance with the obligations to provide security imposed by the L.S.S.A. clauses incorporated in the aforesaid agreement, by 1600 hours GMT on Friday 24th November 2006;

AND I FURTHER AWARD AND DIRECT that the owners of the JOHNNY P cause that vessel to remain at Gibraltar until permitted to do so by the Contractors' consent in writing or until further order,

PROVIDED ALWAYS  that any party to the aforesaid contract may apply to me for a variation of any direction contained in this order.

AND I FURTHER AWARD AND DIRECT that the costs of and associated with this my Interim Final Award (which I hereby tax and settle at £2,750-00) be reserved.

<u>AS WITNESS my hand this 17th day of November 2006</u>

<u>In the presence of:-</u>

Barrister's Clerk,

Quadrant Chambers,
Quadrant House,
10 Fleet Street,
LONDON EC4Y 1AU

2

# JOHNNY P

## R E A S O N S

1.  By a Lloyd's Form agreement dated 29th October 2006, the owners of the ship JOHNNY ("the Shipowners") and of the cargo on board her (the Cargo Owners") agreed with Tsavliris Salvage (International) Ltd ("the Contractors") that the ship and cargo should be salved. The service was successfully completed and terminated at Skaramanga Roads, Greece on 2nd November. Subsequently, the Contractors made a demand for security for their salvage claim from ship and cargo interests. No security was or has been received from cargo interests, but the Contractors permitted the Shipowners to sail from Skaramanga towards Nigeria, where the cargo was destined. This permission was made on terms that the Contractors did not prejudice any rights they had as to security. The ship now lies at Gibraltar. It is clear from the terms of the correspondence, and not disputed by the Shipowners, that so far as concerns the Contractors' right to take steps to enforce their claim to security the position in Gibraltar, where the ship now is the same as it would have been had the vessel remained in Greece.

2.  The Contractors applied for two orders, namely an order requiring that the shippers of the cargo and voyage charterers of the vessel, Transammonia AG ("Transammonia"), put up security for the salvage service; and an order requiring the Shipowners not to sail from Gibraltar until security is put up by or on behalf of cargo.

3.  Transammonia did not attend the hearing, but their stance was made clear in correspondence. At the time of the salvage service, the risk in the cargo had passed to the receivers, Sunshine Oil and Chemical Development, a Nigerian company. Transammonia said that it was that company which ought to be putting up security. They also contended that the application was premature because 21 days had not elapsed since the termination of the salvage, and, unless there was some particular reason to believe that the salved property was to be removed, cause 4.9 of the L.S.S.A. clauses does not permit the property to be detained.

4.  By the time of the hearing it had become virtually common ground that the risk in the cargo had indeed passed on shipment.

1

By the time of the hearing, the property in the cargo had also passed also, but it had not done so until after the formation and indeed the performance of the salvage contract.

5.   I originally considered that there was no great urgency in this matter because the Contractors could always arrest the ship at Gibraltar. I have been persuaded, however, that the need is sufficiently great to arrest the ship, then it must be great enough to detain it by some more informal means. The Shipowners accepted that I had jurisdiction to take such a course. They were prepared to undertake that they would not leave Gibraltar without the written consent of the Contractors. There are though potential hazards if there is no legal process compelling the ship to at Gibraltar notwithstanding a contractual obligation to their charterers to continue with the voyage they have contracted to carry out. There appears to be no hardship to the Shipowners making an order that they do what they are willing to do, and as it marginally reduces the Contractors' risk, the balance of convenience is in favour of my making the order.

6.   Transammonia have rather grandly taken the line that it is up the receivers and their insurers to provide security, and they seem to be moving in the right direction, even if a little slowly. They may require, say Transammonia "some guidance and education". Meanwhile, the Contractors should be patient, because the risk having passed, the security has to come from those insurers.

7.   It is possible, perhaps likely, that those insurers will put up the security in due course; but it does not follow that Transammonia are not liable to do so. Nor is the fact that 21 days has not yet elapsed since the termination of the services relevant to the question of whether or not they are under any such liability. They appear to maintain that they are not so liable. I do not agree. The contract contained in Lloyd's Form is between the parties named in the form. Transammonia were the owners of the cargo at the time of the contact. Article 6 of the Salvage Convention provides that the Master has authority to contract on behalf of the *owner* of property on board, not the person at whose risk that property may be. Accordingly, it appears to me that Transammonia are parties to the salvage agreement. As such they are under an obligation to put up security. There has been reference in the correspondence to the decision of Clarke J

2

in *The Subro Valour*[1] where the learned judge awarded the receivers of cargo certain expenses they had incurred as a result of a salvage in an action for damages against the shipowners of breach of the contract of carriage. But in that case the expenses had actually been incurred by the plaintiffs (or by their underwriters on their behalf) because the risk (though not the property) had passed to them, rather as in this case. The expenses were not incurred on the sellers' behalf, "even if the sellers were strictly liable in the first place". Indeed, Clarke J appears specifically to have envisaged that indeed the primary liability remained with the contracting party. In reality of course, it is the insurers who become involved, usually without reference to the niceties of property transfer under the cif or fob contract. But I agree that the primary responsibility lies with the contracting party and the Transammonia are that party. If the commercial reality is that someone else can be persuaded that it is in their interest to put up the security, that it is all to the good. But there is no reason why the Contractors should abandon their contractual rights in favour of the security provided by the maritime. They have more than one remedy available; and until security is provided, they may use all of them.

8.    That being so, it is right that I should make an order directing Transammonia to perform the contract and provide security. That also requires, as it seems to me, an interim final award in the form of a declaration that the party on whose behalf the Master contracted in respect of the cargo on board was Transammonia. Of course, there is nothing to prevent Transammonia ensuring that the formal legal position is displaced by the true commercial position. But that is a matter for them.

9.    I have considered the period within which Transammonia should provide salvage security, At the hearing there was talk of three banking days. It appears to me, however, that in this context the 21 day period referred to in clause 4.9 of the L.S.S.A. clauses *is* relevant. It is true that the cargo owners are not given a liberty to use the 21 days up in every case: their duty is to put up security forthwith. But when the question arises as to the period in which they can be directed to perform that obligation, I do not think it would be right to abridge the 21 days, now that the Contractors have been given the protection they required in the

1.
_____
[1] [1995] 1 Lloyd's Rep 509, esp at 519.

17-NOV-2006  10:37  FROM  Quadrant Chambers          TO  00302109475301        P.08/08

form of the order against the Shipowners. I therefore direct that the security be put up by 1600 hours GMT on 24th November 2006.

10.    I reserve the costs of these applications.

4

TOTAL P.08

WHEREAS by an Agreement dated the 29th October 2006 on the Standard Salvage Agreement approved and published by the Council of Lloyd's and known as "LOF 2000" made between by Captain George Polychroniou on behalf of Tsavliris Salvage (International) Limited (hereinafter together referred to as the "the Contractors") and by agents for and on behalf of the Owners of the M.V. JOHNNY P, her bunkers, stores, containers and cargo (hereinafter called "the salved interests") it was agreed among other things that the Contractors should use their best endeavours to salve the JOHNNY P and her bunkers, stores, containers and cargo and take them to Piraeus and that in the event of success the remuneration therefor would be decided by arbitration in London in the manner therein prescribed and that the award should be made in United States dollars

AND WHEREAS under the provisions of the said Agreement the Council of Lloyd's appointed me MICHAEL NEWMAN HOWARD, one of Her Majesty's Counsel, as sole Arbitrator;

AND WHEREAS the salved interests other than the owners of the cargo on board the JOHNNY P had settled the Contractors' claim against them, so that the claim for salvage remuneration continued only against those owners of cargo, who are referred to hereinafter as "the Respondents";

NOW THEREFORE I, the said MICHAEL NEWMAN HOWARD, having taken upon myself the burden of the reference in accordance with the terms of the said Agreement, and having duly weighed and considered the evidence and documents laid before me and the arguments of the parties by their respective Counsel who attended before me DO HEREBY MAKE THIS MY FINAL AWARD in writing concerning the matters in question;

AND I FIND AND ADJUDGE that the salved value of the said JOHNNY P was U.S. $4,850,000, that the salved value of her bunkers was U.S. $293,000, and that the salved value of her cargo was U.S. $6,048,911, so that the total value of the salved property was U.S. $11,191,911.00

AND I AWARD AND ADJUDGE that the Respondents do pay to the said Contractors the sum of U.S. $246,179.45 (being the proportion of a global award of U.S. $455,490 which the value of their interest bears to the total salved value) for the salvage services so rendered together with interest at 7.30% per annum from 2nd November 2006 to the date of publication of this my Award and together with any such interest as may fall due in accordance with Clause 8.3 of the LSSA Clauses at the rate of 9.25% per annum;

1

AND I FURTHER AWARD AND ADJUDGE that the Respondents do pay to the Contractors the sum of €23,636.64 and £5,000.00 pursuant to clause 6 of the L.S.S.A. clauses by way of indemnity against costs incurred by the Contractors in respect of their attempts to obtain security.

AND I AWARD AND DIRECT that the Respondents do bear and pay their own and the Contractors' costs of this arbitration (including the costs reserved under my Interim Final Award dated 17th November 2006, if and insofar any part of them are not covered by the immediately preceding paragraph hereof) and that such costs shall include the fees and/or costs charged by the Council of Lloyd's for their services in connection with this arbitration, and the costs of this my Final Award which amount to £7,550 (including my fees in respect of the said Interim Final Award).

<u>AS WITNESS my hand this 21st day of May 2007</u>

In the presence of:-

Barrister's Clerk,

Quadrant Chambers,
Quadrant House,
10 Fleet Street,
LONDON EC4Y 1AU

2

## JOHNNY P

| | |
|---|---|
| **Date and place of salvage** | 29th October to 2nd November 2006 in the Ionian Sea and to Skaramanga Roads. |
| **Description and size of ship salved** | M.V. JOHNNY P<br>Built Osaka 1980<br>16,021 grt; 9,031 nrt<br>Geared bulk carrier: 5 ho 5 ha – 27,148 dwt<br>170.60m x 24.67m<br>Hitachi Zosen 10,550 bhp engine. |
| **Nature and amount of salved cargo, if any** | 21,996.04 mt prilled urea in bulk |

**Value of salved property**

| | U.S. $ |
|---|---|
| Ship sound | 5,000,000.00 |
| Deductions | 150,000.00 |
| Ship Salved | 4,850,000.00 |
| Bunkers | 293,000.00 |
| Cargo | 6,048,911.00 |
| **TOTAL** | **11,191,911.00** |

| | |
|---|---|
| **Particulars of salving vessels etc and their approximate values** | ALEXANDER 5<br>Built 1991<br>545 grt<br>38.30m x 11m<br>2 MAN diesel engines each producing 2,394 bhp, driving two Voith Schneider CPPs. Total 4,788 bhp – 51.5 mt BP.<br>Towing winch. Tow wire 550m x 42mm.<br><br>Value not in evidence. |
| **Nature of casualty** | Casualty adrift following main engine failure on 28th October 2006. |
| **Services** | 1.   Mobilising tug ALEXANDER 5 to casualty.<br>2.   Establishing tow connection.<br>3.   Towing casualty 311 miles to Skaramanga Roads. |
| **Dangers** | 1.   Immobilised until assisted by suitable manned, equipped and powerful tug.<br>2.   Very low order risk of collision. |

**Time occupied in services**   Just under 4½ days.

**Approximate amount of**   None put forward as monies numbered.
**salvage expenses incurred**
**by salvors.**

# JOHNNY P

## R E A S O N S

### A.    NARRATIVE

1.    The JOHNNY P is a venerable (built 1980) five-hold geared bulk carrier. On **23rd October 2006** she sailed from Yuzhny in the Ukraine for Lagos, laden with just under 22,000 of prilled urea. After bunkering at Piraeus on **27th October**, the vessel resumed her westward voyage across the Mediterranean. At about 1730 hours on **28th October**, the vessel lost power when the bolts of the aft coupling of the camshaft broke. Her position was at that time about 110 miles south of Pilos. Within an hour and a half the Chief Engineer reported that he was unable to carry out a temporary repair.

2.    The ALEXANDER 5 is a substantial ocean-going tug of 51.5 tonnes bollard pull. Her Master was contacted at home shortly after midnight on 29th October. He at once went to his tug which sailed at 0315 towards the casualty's position. While en route, the tug and the ship were in contact several times. Where once radio would have been used, the contact was by way of mobile and satellite telephone. Though the wind, a moderate breeze, was varying in direction, the JOHNNY P was apparently drifting to the south west. The tugmaster told his counterpart how the towage connection would be established when the vessels made their rendezvous.

3.    On **30th October** the ALEXANDER 5 came within VHF range of the JOHNNY P and arrangements for the effecting of a towage connection finalised and confirmed. At about 0930, the ALEXANDER 5 came up with the JOHNNY P in a position Latitude 36° 08'N, Longitude 019° 09.8'E. The casualty's crew threw a heaving line to the tug which those on board the tug attached to a towing pennant which was shackled to the main towing wire. The tow towards Piraeus began at 1015. At about noon, the Lloyd's Form was signed, with the owners of the ALEXANDER 5 being party to an award-sharing ISU sub-contract.

4.    The route taken by the tug had been selected to minimise the effect of the bad weather forecast from the northwest, with the Peloponnese providing shelter; but the course was altered when the flotilla nonetheless experienced increasingly bad weather which reached severe gale conditions from the north by 1900 hours. There was an issue about the exact state of the weather with which I deal later in these Reasons. The tow had begun at 6 knots, but the tugmaster was

compelled to reduce the speed to 4 knots. Moreover, the JOHNNY P was no longer able to assist by the use of her steering gear.

5.    The fierce winds continued through the night of **31st October** and speed was reduced further to 3½ knots through the water, and the vessels were making good only about 2 knots over the ground. They were now on radically different headings, with the JOHNNY P streamed out well to starboard of the ALEXANDER 5. The tugmaster intended to head for Messiniakos Bay and sit out the period of bad weather there. Throughout the day, the flotilla continued at an effective 2 knots, and at noon, the tug altered course from 108° to 130°. That had been the heading of the casualty for some hours. The effect was to make the tow somewhat easier with the JOHNNY P following directly astern of the ALEXANDER 5. At 1950, however, those on board the tug observed that one of the strands of the tow-wire had parted where it passed over the rail of the tug. There were 6 strands in all, and the damage had been sustained because the protective sheath which was intended to shield the wire from this sort of event had been damaged in the course of the bad weather. 30 metres of the tow wire was wound back on to the winch, so that the damaged part no longer bore any of the strain. It also meant the sheath was no longer in place. In order to prevent the wire fraying as it passed over the rail, the tugmaster had the wire wound in a further ½ metre every four hours.

6.    Later in the evening, the weather conditions started to improve. The forecast was to the effect that this process could be expected to continue, and the tugmaster abandoned the idea of taking shelter in Messiniakos Bay and decided to force on for Piraeus. By 0600 on **1st November**, the wind had reduced to fresh to strong north-easterly breeze, and at 0745 the tug stopped for ¾ hour so that the sheath for the tow wire could be repaired and reinstated. At about 0450 on **2nd November** the tug was given permission to enter Piraeus. By 0530 the tow wire had been hauled in so that the ships were only about 70 to 100 metres apart. Thereafter the two vessels drifted together until 0800 when they were ordered to the Yellow Buoy to pick up the pilot and proceed to Skaramanga Roads, where, at 1210 hours, the JOHNNY P was disconnected from ALEXANDER 5 and the service came to an end. A redelivery certificate was signed. The total distance covered by the tow was some 311 miles.

2

B.   DANGERS

7.      The principal danger contended for was that of immobilisation until assisted by a tug of sufficient size and power.  Realistically, the Respondents did not challenge this assessment.  The Chief Engineer had indicated that the engine could not be repaired at sea, and that was really an end of the matter.

8.      Immobilisation is itself a major danger.  In the hard commercial world to be out of your money for a substantial period is a misfortune and can spell disaster.  Here the fund was over U.S. $11,000,000.  Though nowadays this is not an unusually high value, it is still a substantial sum of money to have tied up and infructuous.  One has only to think of the daily rate for this hire of a U.S. $5 million dollar ship, such as this was, and then doubling it to allow for the cargo value, to get some appreciation of the opportunity cost involved in this immobilisation.

9.      So far as other dangers are concerned, the Contractors did not contend for any danger of grounding.  Given the low rate of drift and its direction, this was clearly correct.  They did however suggest that there was a risk of collision; and that if such a collision occurred this brought with it the risk of pollution if there was a subsequent escape of oil.  It was accepted by the Respondents that the risk of collision was one which could not be ruled out, but it was submitted that this lay at the very bottom end of the scale of matter which I ought to take into account.  I agree.  The chances of an oncoming ship failing to detect and avoid a substantial radar target, equipped with her own lights and unable to manoeuvre into the path of other vessels are very small indeed.  As the risk of pollution adds several layers of contingency, I dismiss this risk altogether.  And the risk of collision liabilities also seems to me to be beyond the horizon.  If you run into a ship in open water when it is not making way and is visible and probably indicating her predicament, your chances of recovery on the ground that she was negligent rather than that you were are vanishingly small.

10.     *Alternative assistance.*  Manifestly, if the ALEXANDER 5 had not been available, there were many tugs in the central and eastern Mediterranean which could have and would have done the job, albeit they would also have had to be paid salvage.  The Contractors pointed out that no specific alternative tug had been identified.  Though this is true, it is a matter of common experience that substantial tugs are to be found in Malta, in Greece and in Italy.  I hold that there was no possibility of this ship being left for long in the absence of these Contractors.  Indeed, the owners of the ALEXANDER 5 themselves

3

would have been able to salve the JOHNNY P without the intermediation of the Contractors.

C.    SERVICES

11.    This service was promptly rendered. The tug was mobilised quickly after the message was received that the JOHNNY P needed assistance. It is easy to overlook the merits of ocean tows; but this service involved a tow of some 311 miles (and a run out of nearly 300 miles). The conditions in which it was carried out were far from favourable. There was some discrepancy between the winds logged by the tug and those logged by the casualty. Both parties asked me to prefer their own evidence, though the differences were not so great as to make an enormous difference to my assessment of the difficulties of the service. Once the JOHNNY P was under tow, the precise wind speed was less important for her crew than for those on board the ALEXANDER 5 whose evidence is therefore likely to be more reliable. The fact that the sheath for the towing wire was damaged is some corroboration of the tug's figures. The gales the Contractors allege occurred were indeed forecast, so that there was some reason to think that they would occur at the place the tug's crew said that they did. On any view, this was a difficult tow, with just one tug, a substantial laden vessel and conditions which even the Respondents would concede were boisterous. The way in which the tow-wire was managed showed that those on the ALEXANDER 5 crew had planned the tow properly, were paying attention to ensure that it proceeded smoothly and that they showed resourcefulness in overcoming the problem when it occurred. There was a laudable flexibility shown in choosing a different route to enable the flotilla to proceed in greater comfort and safety and then in abandoning that idea when the forecasts showed that the weather would improve.

12.    While these services were worthy and well-performed, they were not particularly difficult or arduous. All ocean tows present some difficulties of their own, and although the weather was unco-operative for a time, it was not so bad as to make the operation in any way unusual in salvage terms.

13.    Captain Polychroniou had responsibility for the overall supervision of the operation once the Contractors had become party to the salvage. The Contractors put this forward as relevant to status; but it seems to me rather an aspect of the services. It is to be taken into account under this head. As the Respondents pointed out, he played a minimal part in the operation. The only identifiable contribution he appears to have

4

was a (proper) decision in favour of inaction when notified of the problem with the tow wire. He gave consideration to the despatch of another tug but in the end decided that the ALEXANDER 5 was capable of doing the job unassisted. Any other decision would have resulted in cost being incurred for no good reason, having regard to the extent of the damage, the ease with which it could be contained and the fact that the weather was expected to improve.

14.    The Respondents rightly prayed in aid a number of matters. They gave out their position so that the Contractors did not have to search for their ship; they initiated the establishment of the towage connection; they used their steering gear to assist in the salvage (except when the weather rendered this impossible); and it is reasonable to infer that they monitored the condition of the tow rope on board their ship as requested by the Contractors. Rightly, it was not suggested that these impacted greatly on the service; but they are to be brought into the overall reckoning.

## D.    VALUES

15.    The Contractors put forward a value of U.S. $4,850,000 for the JOHNNY P, based on a sound value of U.S. $5,000,000 and deductions of U.S. $150,000 in respect of permanent repairs. Both these figures emanated from a qualified surveyor, and were not opposed by the Respondents. I find them to have been properly proved. The invoice value of the cargo was U.S. $6,048,911. This was the value put forward on behalf of cargo underwriters and appears to be a C & F value only. It is likely that the value was greater and unlikely that the value was less, and accordingly I find this figure proved also. Finally, there were bunkers on board the vessel. The evidence was rather confused as to the exact quantities of fuel and diesel on board. Indeed, it is not really clear whether the generators were operating on diesel or gasoil. Taking a conservative view of the value of the bunkers, I find that it amounted in all to U.S. $293,000.

## E.    STATUS

16.    These Contractors are well-known international salvage contractors of the highest class. They have invested heavily in salvage tugs and equipment. Their vessels experience expensive idle time. The fact that the service was performed by a sub-contracted tug does not impact on their status. That depends on their "salvage posture" and their capabilities. The fact that the hardware and personnel used in the service were not part of the Contractors investment programme does

5

not affect this. It does of course have an impact in another way. I deal with that below.

E.    AWARD

17.    These were thoroughly competent services.    They involved a significant ocean tow by a decent-sized tug. There was no physical risk; but I have already noted that immobilisation is not to be treated lightly.    The service was completely straightforward in terms of planning, and pretty much so in terms of execution. I have in mind the guidance past appeal arbitrators have given in relation to cases where there has been an ocean tow in circumstances where the principal danger is immobilisation.  I am also aware that a salvage service is different in kind from a towage service, especially where, as here, the ship is broken down in the middle of the sea. While commercial terms may be negotiated in such a situation, the bargaining power of the parties, indeed the whole context of the negotiation, is entirely different from ordinary tug operations.  There is no possibility of a comparison with a hypothetical "commercial agreement", because no standard agreement would ever be reached in these circumstances.

18.    I bear in mind also that the value of the salved property has an impact on the salvage award.  In a case such as the present where the fund is more than ample, an arbitrator is obliged to make an award which will encourage professional salvors. There are enough cases where there is no cure, or a speculative but abortive sortie, and enough periods where salvage tugs lie unused for the shipping community to have to bear rather higher than normal charges to ensure that salvors are encouraged to stay in business.  Of course, where, as here there are no physical dangers to be taken into account, the size of the fund will have much less effect on the award; but it is still relevant.  The principal that the reward must not be out of all proportion to the work actually done cannot be combined with the guidance on ocean tows so as to produce a niggardly remuneration for salvors.  With a fund of this size and a meritorious if unexceptional service, a generous and encouraging award is called for.

19.    One factor which I must take into account as pointing the other way is the fact that the service was sub-contracted. The Contractors were not using their own men, craft and equipment for the service. This does not mean that their investment is to be ignored for the purposes of assessing their status, but it does mean that both that their status is less directly engaged and that they undertook less in the way of physical and financial risk in the performance of the service.  Although the

6

impact of the fact that a service is wholly or substantially sub-contracted is not as great as is often supposed, it always has some impact on the level of remuneration. Though the Lloyd's Form was not signed until after the tug was under way, it was not suggested that the tug's owners were initially contacted directly. The submission that the Contractors must have been contacted between the Chief Engineer's report to the Master and the despatch of the tug was not challenged. It is the Contractors' reputation as salvors which enables owners of a ship in distress to know where to turn to obtain assistance. Their professionalism and assumption of liability if things go wrong is an important feature of the service from the Respondents' point of view. Against that I take into account two factors. First, where there is an award-sharing subcontract, the professional salvor who has wholly subcontracted the work bears no risk of incurring expense if there is no cure (though he still receives no reward) for whatever it is he has done. Secondly, there are sub-contracted services and sub-contracted services. This is not like the case of a ship in a remote part of the world where the shipowner does not know where he may find a salvage tug or the capabilities of any he might discover. This vessel got into difficulties not far off the coast of Greece, where the shipowners themselves were based. It is likely that they had a good knowledge of the resources available.

20.    In all the circumstances, I consider that a fair award for this salvage service would be U.S. $450,000. The U.S. dollar has declined in value against the Euro since the termination of the services. The Contractors are 80% dollar traders, and evidence was put before me which shows that an upward currency correction of 1.22% is appropriate. Accordingly, the global award will be U.S. $455,490.

F.    SUPPLEMENTARY MATTERS

21.    I award interest under clause 8.1 of the L.S.S.A. at 7.30% (again having regard to the currency split of the Contractors' operations) from 2nd November 2006 and at 9.25% under clause 8.3.

22.    There were two claims under clause 6.3 of the L.S.S.A. clauses for sums expended in attempts to secure the Contractors' claim. The first was for €15,405.19 (part of the fees of the Greek office of their English lawyers), together with counsel's fees of £2,500 in respect of an application to me to order that the ship remained at Gibraltar because it was feared that there would be difficulties in obtaining security at Lagos. This claim was (rightly) not opposed in principle. Nor was the

7

quantum of this part of the claim challenged, and I accordingly allow this sum.

23. The Respondents did however challenge the claim for €8,231.45 (the balance `of the fees of the English lawyers) together with £4,000 being the fees of a Nigerian lawyer. The complaint was first that, after an earlier interim award of MINE, the identity of the cargo owner was established and it would always be possible to enforce against the owners, known as Transammonia. I do not know why this should be said to be so. It might or might not have been possible. Little is known about Transammonia. But the Contractors are in any event entitled to security under their contract. They do not have to weigh up the probabilities. They were entitled to take steps to obtain security even after the date of my interim award.

24. The second point was one of quantum. All that happened was that the Contractors investigated the possibility of arresting the ship and cargo at Lagos, and were advised that they could not in practice do so, because the only way of obtaining security was to begin a substantive action. This the Contractors were not entitled to do, because of the arbitration clause. The Respondents contended that the fee charged by the Nigerian lawyer of £4,000 for the simple answer to a simple question was exorbitant. They suggested that the figure should be reduced to £1,000 in respect of the advice, and that should be the limit, because a simple telephone call would have generated the advice which led to the security claim not being pursued in Nigeria. It was said that the Nigerian lawyer consulted appeared not to have been an experienced shipping lawyer.

25. The Contractors' decision to allow the ship to proceed was one which was for the benefit of the salved interests and potentially to the detriment of the Contractors themselves. It was (again rightly) accepted that the decision was reasonable and that it followed that reasonable legal expenses incurred pursuing the question of how to obtain security in Nigeria were recoverable. I have examined the record of what was done by the Contractors' solicitors in Greece and can see no sign at all that they acted unreasonably after 21st November. No doubt they were surprised and baffled by their inability to arrest; but they had to investigate that question and to go backwards and forwards to the Nigerian lawyer and their clients until it was clear that no more could be done in that regard. I accordingly award the €8,231.45 which arises after that date.

8

26.     There remains the question of the fees of the Nigerian lawyer.  The
        Contractors pointed out that there was no evidence that the lawyer was
        inexperienced in such matters, and that the Contractors themselves had
        succeeded in reducing his fees from £5,500 to the £4,000 that they
        claimed.  Both these submissions cut two ways.  If the lawyer was
        experienced, his advice should have been short and instantaneous.
        There would have been no need for an expensive advice.  And the fact
        that the Contractors were able to reduce his fees by nearly 25% shows
        both that they thought they were being over-charged and that the
        lawyer in question did not feel he could challenge that completely.  In
        my view, the lawyer's fees are grotesque.  I note that the Contractors at
        one stage gave consideration to obtaining advice from a different
        Nigerian lawyer.  I gave consideration to allowing the whole sum,
        because the Contractors managed to achieve a substantial reduction
        and if the Respondents had not failed to provide security in accordance
        with the contract, it need not have been incurred at all.  In the end I
        have decided that Mr Atoyebi is the Contractors' agent and they cannot
        wholly escape the fact that he has charged them too much.  I agree with
        the Respondents that a proper fee would have been £1,000 and I divide
        the excess of £3,000 equally between the Contractors and the
        Respondents.  Accordingly I award a further £2,500 in total in respect
        of these fees.

9

## "JOHNNY P"  - Lot

## FINAL AWARD ON APPEAL

**WHEREAS:**

1. By an agreement dated the 29th October 2006 on the LOF 2000 form of salvage agreement made between Tsavliris Salvage (International) Limited (hereinafter called "the Contractors") and the Owners of the "JOHNNY P" her cargo, bunkers and stores it was agreed amongst other things that the Contractors' remuneration for their services would be determined by arbitration in London.

2. By an award dated the 21st May 2007 Michael Howard QC ("the original arbitrator")

   (a) Found that the salved value of the "JOHNNY P" and her stores was US$4,850,000, that of her bunkers was US$293,000, and that of her cargo was US$6,048,911, making a total salved fund of US$11,191,911.

   (b) Ordered that the Owners of the Cargo on the "JOHNNY P" (hereinafter called "the Respondents") do pay the Contractors for the salvage services their rateable proportion of the sum of US$455,490, together with interest thereon of 7.30% per annum from the 2nd November 2006 until the publication of the award

   (c) And made certain other orders

3. The Contractors appealed against the sum awarded.

4. The Council of Lloyd's in accordance with the terms of the agreement appointed me John Reeder one of Her Majesty's Counsel as Arbitrator on Appeal.

**NOW** I the said JOHN REEDER having taken on the burden of the arbitration in accordance with its terms and having duly weighed and considered the evidence, the original arbitrator's notes and Reasons for the award and the arguments of Counsel for the respective parties who appeared before me DO HEREBY MAKE THIS MY FINAL AWARD ON APPEAL in writing and I INCREASE THE AWARD TO US$435,247.18 (US Dollars Four Hundred and Thirty Five Thousand Five Two Hundred and Forty Seven and Eighteen Cents) being the Respondents' proportionate share of a global award of US$805,310 AND I CONFIRM THE OTHER ORDERS made by the original arbitrator and make the following additional orders

   (a) the Respondents shall bear their own costs and pay the costs of the Contractors of the appeal;

   (b) the Respondents shall pay the fees of the Council of Lloyd's in relation to the appeal and the costs of my award which amount to £8,250 plus VAT (if applicable);

(c) any interest payable on the said fees and costs pursuant to clause 8.3 of the LSSA Clauses shall be at the rate of 9.25% per annum;

As Witness my hand this 11th day of October 2007

In the presence of:

Barrister's Clerk

Stone Chambers

4 Field Court

Gray's Inn

London WC1R 5EF

**"JOHNNY P"**

**REASONS ON APPEAL**

Introduction

1.  This is an appeal by Contractors, Tsavliris Salvage (International) Ltd against an award of Mr Michael Howard QC dated the 21st May 2007 wherein he awarded the Contractors US$450,000 (base award) on a salved fund of US$11,191,911.00 or 4% of the fund for services rendered to the "JOHNNY P" and her cargo in the eastern Mediterranean in October 2006.

2.  The Contractors have appealed on the ground that the award is unjustly too low and unfair. The burden lies on the Contractors to persuade me that the arbitrator erred very substantially in the sum that he awarded.

3.  The arbitrator's findings of fact, the inferences he drew from them and the approach to the award were not in dispute. I shall briefly summarise the facts.

The Facts

4.  The "JOHNNY P" is an elderly five hold bulk carrier. At the time of the casualty on the 28th October 2006, she was in the course of a laden voyage from the Ukraine to Lagos, via Piraeus for bunkers. Her cargo was 21,996 tonnes of prilled urea in bulk. At 17.30 on that day the bolts to the aft coupling on the camshaft failed. At the time the vessel was about 110 miles south of Pilos. The damage was not repairable at sea. Assistance was sought.

5.  The Contractors arranged for the "ALEXANDER 5", a twin screw, 51.5 tonne bollard pull tug, then in Piraeus to proceed to the

1

casualty. She departed for the casualty at 03.15 on the 29th October. The two vessels were in communication with each other from the outset.

6. On the 30th October the towage arrangements were confirmed over VHF. At 09.30 the tug came up with the casualty in a position Lat. 36° 08'N., Long. 019° 09.8' E. The towage connection was passed by heaving line. The connection was quickly effected and at 10.15 the tow began to Piraeus. The LOF was signed at 12.00, and the tug was engaged on ISU award sharing terms.

7. Bad weather was forecast from the northwest. The shelter of the Peloponnese was sought, but by 19.00 the flotilla was experiencing severe gale force northerly winds. Speed was reduced. The bad weather continued, with the flotilla making only about 2 knots over the ground on the 31st October. Course was altered at midday and this made the tow somewhat easier, with the casualty following directly astern. At 19.50, damage was observed to the tow wire, despite a chaff guard being fitted. The guard or sleeve itself had sustained damage which allowed 6 strands of the wire to fray where it passed over the stern. The precaution was taken to shorten the wire at intervals.

8. In the evening conditions improved. The tug master decided to press on to Piraeus. He had considered taking shelter in Messianiakos Bay.

9. By 06.00 on the 1st November the wind had moderated to a strong breeze from the northeast. Shortly afterwards the tug stopped her engines to replace the wire protector. Thereafter the tow proceeded without incident and the vessel was brought into Skaramanga Roads at 12.10 on the 2nd November where she was redelivered. The distance towed was 311 miles.

2

### Dangers

10. The casualty was immobilised until assisted by a tug of sufficient power. The arbitrator also found there was a very low order risk of collision. This would have little impact on the size of the award.

### The Services

11. The Contractors, in submission, sought to underline certain features of the service. There was a prompt response to the casualty, and the right instrument for the job was obtained and mobilised. There was contact with the casualty from an early stage, whereby the nature of the towage connection was discussed well in advance of the tug's arrival. The connection was quickly and efficiently established with the assistance of the casualty's crew.

12. The towage as the weather deteriorated was not easy and progress was slow. The master of the tug had planned a weather route but still experienced severe weather causing damage to the wire protector and the wire itself. When the weather improved the route was altered and the protector renewed.

13. Captain Polychroniou at head office oversaw the operation and had to decide whether to send another tug when he heard the tow wire was damaged. He made an informed decision not to do so.

14. The arbitrator summed up the service (correctly) in these words in paragraph 12 of the Reasons:

    *"While these services were worthy and well performed, they were not particularly difficult or arduous. All ocean tows present some difficulties of their own, and although the weather was unco-*

3

*operative for a time, it was not so bad as to make the operation in any way unusual in salvage terms."*

Values

15.    The values in this case are quite large, amounting in all to US$11,191,911.

Status

16.    The Contractors enjoy a very high status: they have invested heavily in tugs, personnel and equipment and keep tugs on salvage station at great cost to themselves but to the great benefit of the maritime community. They receive no form of subsidy from flag or littoral states where their tugs are stationed to defray the cost of idle time.

17.    I have in mind that one of their own tugs was not used for this service and thus their own investment did not confer the benefit in this casualty. However, their overall salvage posture is still a highly relevant consideration. This subcontract was on ISU award sharing terms, and, ultimately, is likely to be more expensive to the Contractors than a straight commercial agreement at a daily rate. It was also of benefit to the salved property, since the subcontractors were obliged to use their best endeavours in and about the salvage, thus shouldering the same burden assumed by the Contractors.

18.    The Contractors also incur substantial financial risks with abortive sorties, low funds, lack of security and enforcement proceedings.

19.    They are deserving of substantial encouragement.

The Award

4

20.    The Respondents emphasised that this was a case where the casualty was not going to be left for long. They made the submission to the arbitrator that alternative assistance would probably be available on commercial terms.

21.    This submission did not appeal to the arbitrator. He said in paragraph 10 of the Reasons:

*"Manifestly, if the "ALEXANDER 5" had not been available, there were many tugs in the central and eastern Mediterranean which could have and would have done the job, albeit they would also have had to be paid salvage"*

Accordingly the arbitrator appears to have visualised alternative assistance in this case being on salvage terms.

22.    Later, when considering the approach to his award, he stated:

*"I have in mind the guidance past appeal arbitrators have given in relation to cases where there has been an ocean tow in circumstances where the principal danger is immobilisation".*

23.    Whether this guidance holds good today is a matter which I will have to consider on some future occasion since it was not challenged in this appeal. This guidance has received some refinement over the years. The paradigm case is one where there is alternative assistance available on commercial terms.[1] That is not this case because of the finding referred to in paragraph 21 above. What the arbitrator had in mind was the guidance given by one of my predecessors in a case in 1998. It was a case of a 600 mile tow in the Indian Ocean. A subcontracted tug was used. The value was relatively modest. There was no evidence of alternative assistance on commercial terms and no finding that such would or might have

---

[1] See Brice On Maritime Law of Salvage 4th edit paras 2-152-2-152F

been available. The appeal arbitrator set out his approach in these
words:

*"There is no denying that the services required and rendered in
this case were straightforward and well within the capacity of any
competently managed and crewed oceangoing tug. The tow was of
substantial but by no means exceptional length. It was carried out
against the prevailing wind and current and conditions resulted in
sufficient movement of the casualty to require careful handling, but
were no worse than must be regularly encountered in the course of
commercial ocean towages. The Cargo Owners' contention that
this was a clear example of a straightforward rescue towage
cannot therefore be gainsaid. Furthermore the Contractors
realistically did not contend that the salved property was in any
danger beyond that of immobilisation at sea until suitable tug
assistance could be arranged. Such assistance was arranged by the
Contractors at a cost to them of US$189,000. It was submitted on
behalf of the Cargo Owners that in such circumstances, although
account had to be taken of the fact that the services were performed
on salvage terms and of the Contractors' admittedly high status, <u>it
is important that the award should not be wholly out of line with
commercial rates</u>[2]. Otherwise, it was said, owners and
underwriters would be discouraged from contracting on LOF terms
in circumstances similar to those of this case.*

*There is considerable force in this submission. Whilst it is
undoubtedly public policy that salvage services, and those of
professional salvors in particular, should be encouraged by
generous awards, such policy will not be achieved if awards*

---

[2] My emphasis

6

appear to be so high in run of the mill cases that owners and underwriters are discouraged from contracting on salvage terms such as those of LOF. In that event both sides of the shipping and salvage industries may suffer. Professional salvors will suffer if they are deprived of what may be called bread and butter cases and incur additional idle time and unrecovered costs as a result. A modest return on expenditure must be better than none. The more idle time is incurred, the greater are the awards which will be required in more complex cases of danger to the salved property where only the professional salvor can effect a cure, if such professional salvors are to be encouraged to remain in business. The value of the salved property will not necessarily permit such an award to be made in every case. Such a scenario may increase the risk of professional salvors going out of business. That in turn would be to the disadvantage of owners and underwriters, in whose long term interest it must be that professional salvors remain available. It is also not in the public interest if owners, fearing an excessive award, refuse to contract or delay in contracting on salvage terms in an attempt to obtain assistance on commercial terms. It is not unknown for a case, which initially appears not to be one of any imminent danger, to be turned into one, with disastrous consequences, by delay in accepting assistance on salvage terms.

On the other hand, salvors' reasonable expectations must not be ignored. If salvage services are rendered, whether under the general maritime law or on contractual terms such as those of LOF 1995, Article 13 of the International Salvage Convention 1989 must be applied. It is not enough to pay lip service to the Contractors' status. Proper regard must be had to their investment in salvage

7

*and the ongoing costs which will be incurred by those investing in salvage and holding themselves in readiness to perform salvage services, particularly in the case of those few professional salvors who are still prepared to do so on a worldwide basis. In this case the Contractors were able to arrange the required assistance promptly. I have no doubt that this was partly because of their standing arrangements and their reputation and good standing. The engagement of other tugowners may not always proceed so smoothly or on such good terms if shipowners, unknown to such tugowners, seek assistance. Not all will necessarily go out 600 miles or more on commercial terms in a part of the world where intense competition is lacking. The Contractors gave some professional advice at the outset and incurred the contractual responsibility and financial risk. One must also bear in mind that those rendering salvage services are dependent on success for their reward and have to wait for payment until a settlement is reached or an award made; whereas in towage on commercial terms part payment is usually required in advance and the whole is due within a very short time of completion. Interest which is normally awarded to salvors is not always a complete answer to problems of cashflow; and there are cases in which, even after an award has been made, these and other salvors find themselves in practice unable to enforce it or to recover the sum awarded to them.*

*In the end a fair balance has to be struck between these competing considerations. It is apparent from paragraph 17 of her Reasons that the Arbitrator had regard to guidance given in a previous appeal as to the proper approach to this type of case as well as to the matters to be taken into account in favour of the Contractors. The question is whether she got the balance right. This is inevitably*

8

> *a matter of judgment and impression on which two persons, looking at the matter separately, may not agree as to the amount to be awarded. That is why, as indicated in The "Glengyle" [1898] AC 519 at page 521, and in several other cases, an appellate tribunal must not substitute its own opinion (in the absence of error of fact or law on the part of the original tribunal) unless satisfied that the amount awarded is clearly very considerably too much or too little and out of line with what is fair."*

24.    Over the past ten years or so this guidance has been followed in a number of salvage cases where the service has been one of towage. It has done nothing to halt the decline in the salvage industry or in the number of services performed on LOF. I have reviewed these cases and they appear to me to show at best little increase in the reward for this type of case and in some cases the rewards are even less than one would have expected some 9 or 10 years ago. In my judgment sight of the right balance of the competing considerations in the foregoing passages has been lost in some of these cases.

25.    I emphasised above the reference to commercial rates. The arbitrator observed on this subject that whilst commercial terms may be negotiated in this type of case the whole context of negotiation is entirely different from ordinary tug operations and no comparison with a hypothetical "commercial agreement" can be made because no standard agreement would ever be reached in the circumstances. I agree with him.

26.    The fund is relatively large. That is an important consideration. The principle enunciated by Dr Lushington in the **Earl of Eglington**[3] is equally as applicable in the case of immobilisation as it is in a case

---

[3] (1855) Swabey's Admiralty Reports 7. "It must be remembered that, in case of this description, the court gives a greater reward on account of the value of the property

of total loss, but, as the arbitrator rightly observed, the size of the fund will have less effect on the award. He also correctly cautioned against a double counting by applying the guidance given by previous appeal arbitrators in towage cases and the principle in the **Amerique** that the award must not be out of all proportion to the services rendered so as to produce a niggardly award for salvors.

27.  On the contrary, Article 13.1 of the 1989 Salvage Convention requires arbitrators to make awards which will encourage salvage operations. These salvors maintain tugs on salvage station and enjoy a very high status. They deserve that encouragement.

28.  Since the arbitrator erred neither as to fact or principle, the simple question is whether the award is considerably too little for this service. At the outset this award struck me as much too low, and I still consider that it is. It is not sufficiently encouraging. A truly encouraging award for a service of its type by a top class professional can be made in this case, given the size of the fund, without any injustice to the Respondent interests.

29.  In all the circumstances a fair, just and encouraging award in this case is US$790,000. There is a currency correction upwards to be applied of 1.938% which produces a global award of US$805,310, of which the respondents must pay their proportionate share. I accordingly allow this appeal with costs.

10

BLANK ROME, LLP
Attorneys for Plaintiff
TSAVLIRIS SALVAGE (INTERNATIONAL) LTD.
Thomas H. Belknap, Jr. (TB-3188)
The Chrysler Building
405 Lexington Ave.
New York, NY 10174-0208
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TSAVLIRIS SALVAGE (INTERNATIONAL) LTD.<br><br>Plaintiff,<br><br>-against-<br><br>TRANSAMMONIA AG,<br><br>Defendant. | 07 Civ.<br><br>**AFFIDAVIT UNDER<br>SUPPLEMENTAL RULE B** |

STATE OF NEW YORK      )
                                              )      ss:
COUNTY OF NEW YORK   )

THOMAS H. BELKNAP, JR., being duly sworn, deposes and says:

1.      I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome, LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of maritime attachment and garnishment of the property of defendant, TRANSAMMONIA AG ("Defendant"), a foreign corporation, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.      Defendant TRANSAMMONIA AG is a foreign corporation, believed to be Swiss.

3.    Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, the Transportation Tickler, telephone assistance, and a general internet search. In our search, we found the following information:

    a.    According to the Transammonia website (www.transammonia.com), Transammonia Inc. has an office at 320 Park Avenue, New York, NY 10022. Transammonia AG is not listed as having an office in New York, however, but only at Bahnhofstrasse 1, CH-8852 Altendorf, Switzerland and also at Shevkovychna Str. 42-44, Horizon Tower, Room 7B, 01004 Kiev, Ukraine. A copy of these listings are attached as Exhibit A.

    b.    The Transammonia website contains the following legal statement:

> **About Us**
> The members of the Transammonia Group are separate companies engaged in a variety of commodity businesses, and no assumption should be made that the whole group is a single legal entity, or that one member controls another.

A copy of this page from the website is attached as Exhibit B.

    c.    On November 12, 2007, a clerk from our office went to 320 Park Avenue to see if there was any listing for Transammonia AG. Although he identified a listing for "Transammonia," there was no indication that Transammonia AG had an office in the building.

    d.    Transammonia Inc. is registered with the New York Department of State; however, there is no entry for Transammonia AG.

    e.    In a call to Directory Assistance, our clerk was able to find no telephone number for Transammonia AG. Similarly, a review of the information at Yahoo Yellow Pages found a listing for Transammonia Inc. but no listing for Transammonia AG.

       f.     Transammonia AG is not listed in the Transportation Tickler industry

directory for New York.

4.     In the circumstances, while it appears that a corporate relative, Transammonia

Inc. is in New York, I believe Defendant cannot be found within this district.

_____
THOMAS H. BELKNAP, JR.

Sworn to before me this
21st day November, 2007

_____
Notary Public

      LESCENE GIBBONS
  Notary Public, State of New York
     No. 01GI6044509
   Qualified in New York County
Commission Expires July 10, 20 10



| CORPORATE INFO | PRODUCTS | SERVICES | OFFICES | CONTACT US | JOIN US |

North America
Latin America
Europe
Africa
Middle East
Asia

## Offices in North America

### UNITED STATES



**Transammonia, Inc. / New York**          Tel: +1 (212) 223-3200
320 Park Avenue
New York, NY 10022
Cable: TRAMMONIA NEW YORK
Telex: 405336 / 422008 / 428322
Fax: +1 (212) 759-1410
E-Mail: newyork@transammonia.com

**Transammonia, Inc. / Tampa**          Tel: +1 (813) 261-0600
4211 W. Boy Scout Blvd. Suite 600
Tampa, FL 33607-5757
Cable: TRAMMONIA TAMPA
Telex: 810 876 1123 (TRANS AMM TPA)
Fax: +1 (813) 261-0601
E-Mail: tampa@transammonia.com

**Transammonia, Inc. / Nebraska**          Tel: +1 (402) 988-2239
9479 East Birch Road
Adams, NE 68301
Fax: +1 (402) 988-2264
E-Mail: nebraska@transammonia.com

**Transammonia, Inc. / West Des Moines**          Tel: +1 (515) 267-1300
4800 Mills Civic Parkway, Suite 201
West Des Moines, IA 50265
Fax: +1 (515) 267-1333
E-mail: westdesmoines@transammonia.com

**Transammonia, Inc. / Woodlands**          Tel: +1 (281) 363-0987
25227 Grogan's Mill Road
The Woodlands, TX 77380
Fax: +1 (281) 298-5794
E-Mail: woodlands @transammonia.com

**Trammochem / Darien**          Tel: +1 (203) 655-7770
19 Old Kings Highway South
Darien, CT 06820
Telex: 221158 TCHM UR & 221114 TCHEM UR
Fax: +1 (203) 655-8536
E-Mail: darien@trammochem.com

**Sea-3, Inc. / Houston**          Tel: +1 (713) 650-6520
1111 Bagby, Suite 1910
Houston, TX 77002
Fax: +1 (713) 650-3504

**Sea-3, Inc. / Newington**          Tel: +1 (603) 431-5990
190 Shattuck Way
Newington, NH 03801

Fax: +1 (603) 4315652

**Sea-3, Inc. / Portsmouth**　　　　　　　Tel: +1 (603) 436-6225
20 Ladd Street, Suite 200
Portsmouth, NH 03801
Fax: +1 (603) 436-3263
E-mail: sea3inc@aol.com

**Sea-3, Inc. / Tampa**　　　　　　　　　Tel: +1 (813) 873-7759
4211 W. Boy Scout Blvd. Suite 600
Tampa, FL 33607-5757
Fax: +1 (813) 873-7749
E-Mail: tampa@sea-3.com

**Sea-3, Inc. Terminal / Tampa**　　　　　Tel: +1 (813) 241-0550
3606 Pendola Point Road
Tampa, FL 33619
Fax: (813) 241-0730
Email: sea3opsflorida@aol.com

**T/A Terminals, Inc. / Meredosia**　　　　Tel: +1 (217) 584-1472
Meredosia Terminal
1994 Old Grace Road, P.O.Box 408
Meredosia, IL. 62665
Fax: +1 (217) 584-1876

**Trammo Gas International / New York**　　Tel: +1 (212) 223-3200
320 Park Avenue
New York, NY 10022
Fax: +1 (212) 759-1410
E-mail: newyork@trammo.com

**Trammo Gas Domestic / Houston**　　　Tel: +1 (713) 289-5900
1111 Bagby, Suite 1910
Houston, Texas 77002
Fax: +1 (713) 289-5901
E-mail: david.blosser@trammogas.com

**Trammo Petroleum, Inc. / Houston**　　　Tel: +1 (713) 289-8900
1111 Bagby, Suite 1920
Houston, TX 77002
Fax: +1 (713) 650-6650
E-mail: houston@trammopetroleum.com

**Trammo Petroleum, Inc. / Vancouver**　　Tel: +1 (360) 546-1617
14300 NE 20th Avenue, D102-163
Vancouver, WA 98686
Fax: +1 (360) 546-1662
E-Mail: vancouver@trammopetroleum.com

**Trammo Petroleum, Inc. / El Dorado Hills**　Tel: +1 (916) 933-7200
4989 Golden Foothill Parkway
Suite 2
El Dorado Hills, CA 95762
Fax: +1 (916) 933-7215
E-mail: eldoradohills@trammopetroleum.com

**Trammo Petroleum, Inc. / Torrance**　　　Tel: +1 (310) 891-0070
22930 Crenshaw Blvd., Suite H
Torrance, CA 90505
Fax: +1 (310) 891-0176
E-mail: torrance@trammopetroleum.com

© by Transammonia AG

{Bild}



**CORPORATE INFO**   **PRODUCTS**   **SERVICES**   **OFFICES**   **CONTACT US**   **JOIN US**

North America
Latin America
Europe
Africa
Middle East
Asia

# Offices in Europe

**FRANCE**
**Transammonia SARL**                          Tel: +33 (1) 58 18 33 80
23 Rue Balzac
75008 Paris, France
Fax: +33 (1) 58 18 33 81
E-Mail: paris@transammonia.com

Transammonia SARL / Fertilizers              Tel: +33 (1) 58 18 33 95
23 Rue Balzac
75008 Paris, France
Fax: +33 (1) 58 18 33 82
E-Mail: paris.fertilizers@transammonia.com

**NETHERLANDS**
**Transammonia B.V.**                          Tel: +31 (76) 520-9099
Service Company for Transammonia AG
Oudlandstraatje 25
4838 BL Breda, Netherlands
Fax: +31 (76) 522-3143
E-Mail: breda@transammonia.com

**ROMANIA**
**Transammonia AG**                            Tel: +40 (21) 230-5430
33, Muzeul Zambaccian St.
2nd Floor, Ap. 6
Bucharest, Romania
Telex: 11813 ROTAG R
Fax: +40 (21) 230-5328
E-Mail: bucharest@transammonia.com

**RUSSIA**
**Transammonia AG**                            Tel: +70 (95) 258-5622
**Trammochem AG**
Riverside Towers
Kosmodamianskaya emb. 52 bld 4,
3rd Floor
115054 Moscow
Telex: 612750 AMMO
Fax: +70 (95) 258-5623
E-Mail: moscow@transammonia.com

**SWITZERLAND**
**Transammonia AG / Trading**                  Tel: +41 (55) 451-1555
Bahnhofstrasse 1
CH-8852, Altendorf, Switzerland
Telex: 051 94076604-TAFA G
Fax: +41 (55) 451-1556
E-Mail: altendorf@transammonia.com

**Transammonia AG / Chartering**               Tel: +41 (55) 451-1666
Bahnhofstrasse 1
CH-8852 Altendorf, Switzerland
Telex: 051 94076600-TACA G
Fax: +41 (55) 451-1667

E-Mail: chartering@transammonia.com

**Transammonia AG / Traffic**                    Tel: +41 (55) 451-1555
Bahnhofstrasse 1
CH-8852, Altendorf, Switzerland
Fax: +41 (55) 451-1641
Email: traffic@transammonia.com

**Trammochem AG**                                Tel: +41 (55) 451-1444
Bahnhofstrasse 1
CH-8852, Altendorf, Switzerland
Telex: 876410 AMO CH
Fax: +41 (55) 451-1464
E-Mail: altendorf@trammochem.com

**TURKEY**
**Transammonia Ltd.**                            Tel: +90 (212) 358-2224
Ulus Mahallesi, Tekfen Sitesi
Birlik Apt. A Blok D:1
80600 Etiler, Istanbul
Telex: 27337 TAFE TR
Fax:+90 (212) 358-2233
Email: istanbul@transammonia.com

**UKRAINE**
**Transammonia AG**                              Tel: +380 (44) 490-3999
Shevkovychna Str. 42-44
Horizon Tower, Room 7B
01004 Kiev, Ukraine
Fax: +380 944) 490-3993
E-mail: kiev@transammonia.com

**UNITED KINGDOM**
**Trammo Ltd.**                                  Tel: +44 (20) 7016-9991
Agent for Trammo Gas International, Inc.
and Trammo Navigation Limited
1 Berkeley Street
London
W1J 8DJ
United Kingdom
Fax: +41 (55) 451-1649
E-mail: london@trammo.com

**Transammonia**

CORPORATE INFO    PRODUCTS    SERVICES    OFFICES    CONTACT US    JOIN US

History

Corporate Structure

Facts & Figures

Legal Information

# Legal Information

### About Us

The members of the Transammonia Group are separate companies engaged in a variety of commodity businesses, and no assumption should be made that the whole group or any part of the group is a single legal entity, or that one member controls another.



### Limitaion of Liability

The information contained in the website is not comprehensive. Despite our efforts, it may not be accurate, up to date or applicable to the circumstances of any particular case. The Transammonia Group does not accept liability for any direct, indirect, special, consequential or other losses or damages of whatsoever kind arising out of access to, or use of this website or any information contained in it.

### Copyright and Trademarks

The copyright in the contents from this website is owned by the Transammonia Group. The Transammonia trademark and its logo are owned by Transammonia, Inc. You are responsible for obeying all applicable copyright laws and trademark laws.